UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOMINION CAPITAL LLC, | |
| Plaintiff, | Case No. 1:26-cv-1672 |
| v. | |
| RELIZ LTD. d/b/a BLOCKFILLS.COM, | **COMPLAINT** |
| Defendants. | |

Dominion Capital LLC ("Dominion" or "Plaintiff"), by its attorneys, Sullivan & Worcester LLP, for its Complaint against Reliz Ltd., doing business as Blockfills.com ("Blockfills" or "Defendant"), states as follows:

## NATURE OF THE ACTION

1.      This action concerns Blockfills' ongoing misappropriation of customer assets, its fraudulent concealment of that misappropriation, and its unlawful retention and refusal to return millions of dollars' worth of cryptocurrency assets that Dominion had stored on the Blockfills platform.

2.      Blockfills, a crypto brokerage and trading platform, accepted Dominion as a customer in April 2021, including by approving Dominion's account and assigning it an account number.  The account-opening documentation included two signed agreements: the Blockfills Customer Account Application (the "Application Agreement"), which governs, *inter alia*, how customer assets are maintained and segregated by Blockfills, and the Electronic All-Inclusive Trading Agreement (the "Trading Agreement"), which governs electronic trading through Blockfills' system.  Since signing these agreements in 2021, Dominion has traded and stored cryptocurrency assets (including Bitcoin) with Blockfills.

3.      In February 2026, however, Blockfills suddenly announced that it was suspending customer withdrawals.  Dominion then learned, through admissions by Blockfills itself, that Blockfills had been misappropriating customer assets to cover its operational costs and losses since at least 2025, and that the misappropriation is ongoing.  On February 11, 2026, Dominion formally requested the return of its cryptocurrency assets located on the Blockfills platform.  Blockfills refused.

4.      Not only has Blockfills refused to return the assets owned by Dominion, but, upon information and belief (including based on Blockfills' own admissions), it continues to unlawfully use and deplete Dominion's assets for its own purposes.  In light of Blockfills' unlawful conduct, Dominion pleads claims for: (a) fraudulent concealment (based on Blockfills' non-disclosure of comingling and misuse of customer assets and related withholding), (b) conversion (based on Blockfills' unauthorized dominion over Dominion's assets), (c) breach of contract (including breach of the Application Agreement and breach of the implied covenant of good faith and fair dealing), (d) breach of the implied covenant of good faith and fair dealing to the extent independently cognizable, (e) unjust enrichment, and (f) violation of the Illinois Consumer Fraud Act (since Blockfills has its principal place of business in Illinois).

5.      Dominion seeks the release and return of its property interest (Bitcoin assets), actual, compensatory, and punitive damages in an amount to be proven at trial, prejudgment interest, costs, and such equitable relief as the Court deems just and proper.  In addition, including by separate motion, Dominion is seeking a preliminary injunction freezing Blockfills' assets so that it cannot further deplete or transfer Dominion's property interest.

## THE PARTIES

6.      Dominion is a Connecticut private limited liability company.  It maintains its headquarters in New York City.  Dominion's members are citizens of the States of Delaware, New Jersey, New York, and Florida; none of its members are citizens of the Cayman Islands or Illinois.

7.      Upon information and belief, Reliz Ltd. is a Cayman Islands Limited Corporation, doing business as Blockfills.com, with its principal place of business located in Chicago, Illinois.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $ 75,000 exclusive of costs and interests.

9.      Blockfills is subject to personal jurisdiction in the Southern District of New York pursuant to CPLR §302 because it operates a trading platform that engages in interstate and/or international commerce and its misappropriation of Dominion's assets, giving rise to this action, caused financial harm to Dominion in New York.  Further, Blockfills solicited and accepted Dominion's account application from New York, met with Dominion officials in New York, and received deposits from Dominion's New York-based bank.  Further, Blockfills' website also states that it maintains "global offices" in New York.

10.     Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §§ 1391(b)(2) and (b)(3), because a substantial part of the events and omissions giving rise to the claims occurred in this district and Blockfills is subject to personal jurisdiction here.

## FACTUAL ALLEGATIONS

### A.    Account Application and Agreements

11.     In or about April 2021, Dominion began communications with Blockfills about Dominion becoming a customer with Blockfills.

12.     In particular, Dominion began communications with Blockfills' Director of Sales & OTC Trading, Neil Van Huis, and its then-CEO, Nick Hammer.  Messrs. Van Huis and Hammer conducted an initial call with Dominion to introduce them to the Blockfills' system, and Mr. Huis discussed and guided Dominion through the onboarding process.

13.     On or about April 12, 2021, Dominion submitted the Blockfills Customer Account Application (the "Application Agreement"), a copy of which is attached hereto as <u>Exhibit 1</u>.[1]

14.     Pursuant to its terms, the Application Agreement is "a legally binding contractual agreement."  Exhibit 1 at page 10.

15.     The Application Agreement contains a critical provision regarding the segregation of customer funds, in which Blockfills represented and agreed to keep customer money "segregated" from Blockfills' working capital:

> Client Money: That as a Professional Client and according to clause 6 of the trading agreement, you hereby acknowledge (unless Blockfills.com agrees is [sic] writing in a separate letter) that;
>
> (1) money deposited by you with Blockfills.com will be segregated from the working capital of Blockfills.com until you execute an order through Blockfills.com; As a consequence of exectuting [sic] an order, Blockfills.com has the right to move your money in any amount not to exceed the amount of the trade to its counterparties at its sole discretion; . . .

Exhibit 1 at pages 10-11.

16.     On the same day, April 12, 2021, Dominion also executed Blockfills' Electronic All-Inclusive Trading Agreement (the "Trading Agreement"), a copy of which is attached hereto as <u>Exhibit 2</u>.

17.     The Trading Agreement governs all aspects of electronic trading through Blockfills' systems.

---

[1] In all exhibits, protected personal information such as taxpayer identification numbers or bank account numbers have been redacted.

18.     On or about April 20, 2021, Blockfills accepted Dominion's application and assigned it an account number.

19.     Thereafter, over time, Dominion made several deposits of Bitcoin and regularly traded on Blockfills' platform in accordance with the Application Agreement and Trading Agreement (collectively the "Agreements").

20.     As of February 11, 2026, Dominion had 70.5556739914 Bitcoin (the "Dominion Property Assets") and USD 186.23 in its account with Blockfills.

**B.     Blockfills' Suspension of Withdrawals**

21.     At some point during the week of February 2-6, 2026 (and before the town halls) Blockfills suddenly suspended client withdrawals for all customers.

22.     Blockfills did not provide advance notice or any warning of the suspension of withdrawals to Dominion.[2]

23.     In a statement on February 11, 2026, Blockfills explained:

> In light of recent market and financial conditions, and to further the protection of clients and the firm, BlockFills took the action last week of temporarily suspending client deposits and withdrawals. . . .
>
> BlockFills is committed to transparency in its communications and to the protection of its clients. Management has been working hand in hand with investors and clients to bring this issue to a swift resolution and to restore liquidity to the platform. The firm has also been in active dialogue with our clients throughout this process, including information sessions and an opportunity to ask questions of senior management. BlockFills is working tirelessly to bring this matter to a conclusion and will continue to regularly update our clients as developments warrant.

*See* https://www.blockfills.com/2026/02/11/blockfills-statement-on-recent-temporary-suspension-on-client-deposits-withdrawals-02-11-2026/ (last accessed on February 21, 2026).

---

[2] According to a recent news article, however, an anonymous source has alleged that Blockfills urged some clients to withdraw their crypto assets before the platform halted deposits and withdrawals. *See* https://www.coindesk.com/business/2026/02/25/blockfills-co-founder-and-ceo-nicholas-hammer-has-stepped-down-amid-usd75-million-lending-losses (last accessed Feb. 27, 2026). If accurate, it would further support Dominion's claims, including its fraudulent concealment claim.

24.     As a result of the suspension, Dominion has been prevented from accessing, withdrawing or otherwise exercising its possessory rights over the Dominion Property Assets, even though such assets are owned by Dominion.

**C.     Blockfills' Admissions of Misappropriation of Customer Assets**

25.     When Dominion learned of Blockfills' suspension of customer withdrawals, on February 6, 2026, Dominion requested a call with Blockfills.

26.     On February 7, 2026, Dominion's Gennadiy and Mikhail Gurevich participated in a call with Blockfills' Joe Perry and Gordon Wallace and Blockfills' advisor, Mark Renzi from Berkeley Research Group, LLC ("BRG"). At this call, Blockfills admitted to having commingled customer assets and having a balance sheet shortfall.

27.     This was the first time that Blockfills disclosed the commingling and misappropriation of customer assets to Dominion.

28.     The following week, in two separate "town hall" meetings held with its customers on February 9, 2026 ("Townhall 1") and February 20, 2026 ("Townhall 2"), Blockfills again admitted to the commingling and misappropriating customer assets to cover its own expenses and losses. Blockfills also admitted that the misappropriation is ongoing.

29.     Specifically, Blockfills admitted during Townhall 2 that its customers' digital assets were "not segregated per client" and were "not segregated on separate wallets per customer" but were commingled into "one balance sheet."

30.     Blockfills further admitted that it used these commingled customer funds/assets to cover (without limitation):

a.  expenses for various arbitrations, including for a settlement with Celsius Network, a cryptocurrency platform and lender to Blockfills that prevailed in several arbitrations against Blockfills;

    b.   expenses for the purchase of crypto mining equipment;

    c.   losses in connection with crypto mining operations;

    d.   losses in connection with crypto mining hedging activities; and

    e.   losses in connection with unsecured loans made to several entities, including to Aexa Digital Infrastructure, Babel, and CoinSource.

31.    Blockfills also admitted during the February 7 call and the town halls that the payment of these expenses and losses had caused a balance sheet shortfall of $77 million as of December 31, 2025.

32.    These uses of customer funds (including the Dominion Property Assets) were unauthorized and violated the Application Agreement's requirement that customer funds be segregated and used only in connection with customer trades.

**D.    Blockfills' Knowledge and Concealment of the Misappropriation**

33.    Making matters worse, Blockfills intentionally concealed its misuse of funds from its customers, including Dominion.

34.    According to Blockfills' own explanations at Townhall 1, Blockfills' Board of Directors became aware of the misappropriation of customer funds in or around August 2025. Blockfills also told clients that, following the board's discovery of the misappropriation, Blockfills engaged restructuring advisors—including Katten Muchin Roseman LLP and BRG—to develop a preliminary restructuring plan.

35.    However, despite its board's discovery of the misappropriations in August 2025, Blockfills did not inform Dominion of the fund misappropriation in August 2025 or at any other point prior to February 2026.

36.    In fact, despite knowingly concealing the misappropriation and balance sheet shortfall, Blockfills continued to solicit trades from Dominion.  For example, on February 12,

2025, Gordon Wallace—the President and co-founder of Blockfills, and a member of its board of directors—reached out to Dominion and suggested a Bitcoin options trade.

37.    In the end, Blockfills concealed the misappropriation from Dominion for approximately six months, from August 2025 through early February 2026.  Throughout this period, Blockfills continued to retain possession of the Dominion Property Assets and, upon information and belief, used them to cover its own expenses and losses.

### E.    Blockfills' Admission of Past and Ongoing Misappropriation

38.    By email dated February 6, 2026, Dominion was invited to Townhall 1 by Joe Perry, interim CEO of Blockfills.  In the email, Mr. Perry referred to the "temporary" suspension of client withdrawals and invited a select number of clients to an "informational town hall for our clients to share updates on BlockFills' current status, provide clarity on next steps, and address your questions directly."

39.    Townhall 1 was conducted via Zoom on Monday, February 9, 2026, at 10 a.m. ET. An estimated 44 participants attended the Zoom meeting.  From Blockfills' side, Joe Perry and Gordon Wallace attended, together with Blockfills' restructuring advisor, Mark Renzi from BRG. For Dominion, its managing members Gennadiy Gurevich and Mikhail Gurevich attended.

40.    During Townhall 1, as on the Dominion-Blockfills call on February 7, 2026 (*supra* paragraph 26), Blockfills representatives explained that Blockfills had commingled customer assets and company assets on one balance sheet.  They admitted that Blockfills had used these commingled assets to cover operational expenses and losses as described above (paragraph 30).

41.    To emphasize these admissions, Blockfills even presented slides showing, among other things, a timeline of when the commingling and shortfall was discovered in August 2025, and an overview of Blockfills' operational costs and losses that were paid with the commingled customer assets.

42.    On Friday, February 20, 2026, at 10 a.m. ET, Blockfills conducted Townhall 2. The meeting was again led by Perry and Wallace from Blockfills and Renzi from BRG; Mr. Gurevitch joined on behalf of Dominion.

43.    At Townhall 2, Blockfills confirmed its previous admissions, reiterating that it had commingled customer funds on one single balance sheet and used the funds to pay for certain material expenses and losses which had left a balance sheet shortfall of $77 million.

44.    During Townhall 2, Blockfills was asked if it is continuing to use customer funds to pay for operating, legal, consulting and restructuring expenses. Blockfills did not deny the ongoing use of commingled customer funds for operational expenses and only replied that "the company is paying for restructuring expenses".

**F.    Dominion's Redemption Request and Defendant's Non-Response**

45.    Blockfills' suspension of customer withdrawals in early February 2026 is all the more concerning in light of Blockfills' nearly simultaneous disclosure regarding the misappropriation of customer funds and assets, calling into question whether Dominion will ever regain access to its Dominion Property Assets, or whether Blockfills will deplete them by improperly using them for its own purposes, including by transferring them to third-party creditors to satisfy its debts or loans.

46.    Via written notice on February 11, 2026, Dominion formally requested the redemption for the full amount of the Dominion Property Assets in Dominion's account with Blockfills.

47.    On February 12, 2026, Mr. Renzi (BRG) replied that "[w]e are working on a comprehensive solution. We cannot treat one customer differently than another."

48.    As of the filing of this Complaint, Blockfills has neither returned any portion of the Dominion Property Assets, nor provided any assurance or verification that the Dominion Property Assets still exist or remain in Blockfills' custody, possession, or control.

**G.    Dominion's Damages**

49.    As a result of Defendant's conduct, Dominion has been unable to access the Dominion Property Assets held in its account with Blockfills.

50.    The value of the Dominion Property Assets is substantial and will be determined at trial.

51.    In addition to the value of the Dominion Property Assets themselves, Dominion has also suffered additional damages, including lost business, investment, and trading opportunities as a result of its inability to access its assets.

52.    Dominion has suffered, and will continue to suffer, other consequential damages, including litigation and collection costs, as a result of Blockfills' conduct.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CAUSE OF ACTION**
<u>**Fraudulent Concealment**</u>

53.    Dominion repeats and realleges the foregoing paragraphs as if fully set forth herein.

54.    Blockfills had a duty to keep the assets of Dominion and other customers segregated and use them only in connection with customer trades.

55.    That duty arose from the contractual relationship between Dominion and Blockfills and further due to the fact that Blockfills was holding Dominion's assets in trust.

56.    However, beginning by no later than 2025, Blockfills improperly commingled customer assets and used customer assets, including (upon information and belief) the Dominion Property Assets, to pay for certain expenses of Blockfills, including but not limited to expenses

for a settlement with Celsius Network and crypto mining equipment, and losses in connection with mining and mining hedging (the "Misappropriation").

57.    The Misappropriation was a material fact that Blockfills was obligated immediately to disclose to Dominion.

58.    Blockfills' duty to disclose the Misappropriation arose, for one, from its confidential relationship with Dominion because it is holding Dominion's assets and funds on Blockfills' trading platform.  Further, under the "special facts doctrine," Blockfills also had a duty to disclose because it had superior knowledge not readily available to Dominion and Blockfills knew that Dominion was acting on mistaken knowledge.

59.    Blockfills had knowledge of the material fact that it had misappropriated customer funds and assets.

60.    Blockfills' board of directors discovered the Misappropriation in or around August 2025.

61.    Blockfills knew that Dominion was not aware of the Misappropriation.

62.    Blockfills knew or should have known that Dominion relied on Blockfills to immediately notify it of any misappropriation.

63.    Blockfills did not disclose the Misappropriation to Dominion until February 9, 2026, the date of the Townhall 1 Zoom meeting.

64.    Blockfills intended that Dominion rely on its concealment of the Misappropriation.

65.    Blockfills intended to induce Dominion to continue depositing funds and to refrain from withdrawing funds by concealing the Misappropriation.

66.    In fact, in November 2025, Blockfills contacted Dominion to solicit further trades.

67.     Dominion reasonably relied on Blockfills not to misappropriate its funds or assets and to immediately disclose any misappropriation of its funds or assets.

68.     Dominion had no reason to believe that Defendant was misappropriating customer funds or assets.

69.     Dominion suffered damages as a result of Blockfills' fraudulent concealment, including but not limited to the loss of its ability to possess or use the Dominion Property Assets.

70.     Defendant's concealment of the Misappropriation prevented Dominion from taking action to protect its interests.

71.     If Dominion had known of the Misappropriation, Dominion would have immediately withdrawn its funds and assets and ceased doing business with Blockfills.  However, Blockfills suspended withdrawals when it finally announced the Misappropriation, thereby preventing Dominion from having any opportunity to withdraw its assets.

72.     To date, Dominion remains unable to access the 70.5556739914 Bitcoin held in its account with Blockfills.

73.     In addition to being deprived of the Dominion Property Assets themselves, Dominion has also suffered additional damages, including but not limited to lost trading opportunities due to its inability to access the Dominion Property Assets.

74.     If Dominion had known of the Misappropriation, Dominion could have sold its Bitcoin, the price for which has since fallen from over $123,000 in August 2025 to approximately $67,972.82 at the time that the Misappropriation was disclosed.

75.     If Dominion had known of the Misappropriation, it would have immediately moved to estop Blockfills from continuing to use Dominion's assets for Blockfills' own personal benefit, and to prevent further depletion and/or transfer of its assets.

76.     Dominion has also suffered other consequential damages, including collection costs and attorneys' fees.

## SECOND CAUSE OF ACTION
### Conversion

77.     Dominion repeats and realleges the foregoing paragraphs as if fully set forth herein.

78.     Dominion had a right to the Dominion Property Assets in its cash account with Blockfills.

79.     The Dominion Property Assets were specifically identifiable in Dominion's account.

80.     The Application Agreement confirmed that Dominion's assets would be segregated and held for the benefit of Dominion.

81.     Dominion had an immediate superior right to possession of the Dominion Property Assets.

82.     Blockfills has exercised unauthorized dominion and control over the Dominion Property Assets by denying Dominion its right to access their assets as a result of the purported "suspension" of withdrawals.  Upon information and belief, Blockfills has further exercised unauthorized dominion and control over the Dominion Property Assets by using them to pay for Blockfills' own expenses and losses.

83.     Blockfills' use of Dominion's property was to the exclusion of Dominion's rights and without Dominion's authorization.

84.     This use was unauthorized because the Application Agreement explicitly required that customer funds be segregated and used only in connection with customer trades, not for Blockfills' own corporate expenses.

85.     Blockfills intended to exercise dominion or control over the Dominion Property Assets.

86.     Blockfills' use of the Dominion Property Assets for corporate expenses demonstrates an intent to treat the funds as its own property rather than as customer property held in trust.

87.     Blockfills suspended withdrawals in early February 2026, preventing Dominion from accessing the Dominion Property Assets.

88.     Blockfills refused Dominion's redemption request on February 11, 2026, further demonstrating Blockfills' intent to exercise improper dominion and control over the Dominion Property Assets.

89.     As a direct and proximate result of Blockfills' conversion, Dominion suffered damages in an amount to be determined at trial but, at a minimum, the equivalent value of 70.5556739914 Bitcoin.

90.     Dominion has also suffered additional damages, including, but not limited to, lost trading opportunities and other consequential damages, including collection costs and attorneys' fees.

## THIRD CAUSE OF ACTION
### Breach of Contract

91.     Dominion repeats and realleges the foregoing paragraphs as if fully set forth herein.

92.     The Application Agreement is a binding contract between Dominion and Blockfills.

93.     Dominion performed its obligations under the Application Agreement.

94.     The Application Agreement explicitly provides that money deposited by customers with Blockfills will be segregated from the working capital of Blockfills.

95. Pursuant to the Application Agreement, Blockfills warranted and agreed to keep Dominion's funds segregated from its working capital and, when Dominion is placing an order, to move money only in the amount of the trade.

96. Blockfills breached the Application Agreement by failing to (i) keep Dominion's funds segregated, or (ii) use the funds for trades by Dominion only.

97. In fact, at Townhall 2, Blockfills admitted that its customers' digital assets were "not segregated per client" and were "not segregated on separate wallets per customer".

98. Upon information and belief, Blockfills further breached the Application Agreement by using Dominion's assets to pay for its own expenses.

99. The Application Agreement includes an implied covenant of good faith and fair dealing. This implied covenant requires each contracting party not to do anything that will have the effect of destroying or injuring the other party's right to receive its bargained-for benefits under the Application Agreement.

100. Defendant breached the implied covenant of good faith and fair dealing of the Application Agreement by misappropriating Dominion's funds for its own use.

101. Defendant breached the implied covenant of good faith and fair dealing of the Application Agreement by concealing its misappropriation of Dominion's funds.

102. Defendant breached the implied covenant of good faith and fair dealing of the Application Agreement by suspending customer withdrawals in February 2026.

103. Defendant breached the implied covenant of good faith and fair dealing of the Application Agreement by refusing to return Dominion's funds.

104.    As a direct and proximate result of Blockfills' breaches of contract, Dominion suffered damages in an amount to be determined at trial but, at a minimum, the equivalent value of 70.5556739914 Bitcoin.

105.    Dominion has also suffered additional damages, including, but not limited to, lost trading opportunities and other consequential damages, including collections costs and attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing (New York law)**

106.    Dominion repeats and realleges the foregoing paragraphs as if fully set forth herein.

107.    The Application Agreement and Trading Agreement (the "Agreements"), both executed on April 12, 2021, are binding contracts between Dominion and Blockfills.

108.    These contracts contain implied covenants of good faith and fair dealing.

109.    Dominion performed its obligations under the Agreements, including the covenants of good faith and fair dealing.

110.    Blockfills breached the implied covenants of good faith and fair dealing under the Agreements by misappropriating Dominion's funds for its own use.

111.    Blockfills further breached the implied covenants of good faith and fair dealing by concealing its misappropriation of Dominion's funds.

112.    This concealment was done in bad faith and deprived Dominion of the ability to make informed decisions about its account.

113.    If Dominion had known of the misappropriation, Dominion would have immediately withdrawn its funds.

114.    Additionally, Blockfills breached the implied covenants of good faith and fair dealing by suspending customer withdrawals in February 2026.

115.    This conduct was done in bad faith and deprived Dominion of the benefit of its contracts with Blockfills, which included having access to its assets and funds.

116.    Blockfills breached the implied covenant of good faith and fair dealing by refusing to return Dominion's assets and funds.

117.    This conduct further demonstrates bad faith and has deprived Dominion of the benefits of the Agreements.

118.    As a direct and proximate result of Blockfills' breaches of the implied covenant of good faith and fair dealing, Dominion suffered damages in an amount to be determined at trial but, at a minimum, the equivalent value of 70.5556739914 Bitcoin.

119.    Dominion has also suffered additional damages, including, but not limited to, lost trading opportunities and other consequential damages, including collections costs and attorneys' fees.

## FIFTH CAUSE OF ACTION
### Alternatively: Unjust Enrichment

120.    Dominion repeats and realleges the foregoing paragraphs as if fully set forth herein.

121.    Dominion conferred benefits on Blockfills by transmitting cryptocurrency assets to Blockfills and by regularly making trades through Blockfills' platform, generating fees and revenue for Blockfills.

122.    As of February 11, 2026, Dominion had the Dominion Assets (70.5556739914 Bitcoin) in its cash account with Blockfills.

123.    Blockfills accepted and appreciated the benefit conferred by Dominion.

124.    Blockfills accepted Dominion's deposits.

125.    Blockfills was supposed to segregate customer funds and assets and use them only in connection with authorized customer trades and in accordance with other customer direction, not for Blockfills' corporate purposes.

126.    Upon information and belief, Blockfills used Dominion's funds and assets to cover corporate expenses, including a settlement with Celsius, losses in connection with mining operations, mining equipment purchases, and mining hedging activities.

127.    Blockfills concealed the misappropriation of customer funds from Dominion for at least six months, preventing Dominion from taking action to protect its interests.

128.    Then, Blockfills suspended withdrawals and refused to return Dominion's funds and assets, despite Dominion's formal redemption request on February 11, 2026.

129.    It would be inequitable to allow Blockfills to retain the benefit of having access to, and use of, Dominion's funds and assets when Blockfills used those funds and assets for unauthorized purposes and then refused to return them.

130.    Dominion suffered damages as a result of Defendant's unjust enrichment, including its inability to access (and loss of possession of) the 70.5556739914 Bitcoin held in its account with Bitcoin.

131.    The value of 70.5556739914 Bitcoin is substantial and will be determined at trial.

132.    Dominion has also suffered lost trading opportunities and other consequential damages, including collection costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### Violation of the Illinois Consumer Fraud Act

133.    Dominion repeats and realleges the foregoing paragraphs as if fully set forth herein.

134.    Blockfills had a duty to keep the funds of Dominion and other customers segregated and use them only in connection with customer trades.

135.    That duty arose from the contractual relationship between Dominion and Blockfills and the fact that Blockfills was holding Dominion's funds in trust.

136.    However, beginning by no later than 2025, Blockfills improperly commingled customer funds and used customer funds and assets, including (upon information and belief) the Dominion Property Assets, to pay for certain expenses of Blockfills, including but not limited to expenses for a settlement with Celsius and mining equipment, and losses in connection with mining and mining hedging (the "Misappropriation").

137.    The Misappropriation was a deceptive practice that had the tendency or capacity to mislead or deceive customers.

138.    Upon information and belief, Blockfills board of directors discovered the Misappropriation by no later than August 2025.

139.    Blockfills knew that Dominion was not aware of the Misappropriation.

140.    Blockfills knew or should have known that Dominion relied on Blockfills to immediately notify it of any misappropriation.

141.    Blockfills did not disclose the Misappropriation to Dominion until February 9, 2026.

142.    This concealment was a deceptive practice that had the tendency or capacity to mislead or deceive customers.

143.    Blockfills intended that Dominion rely on its concealment of the Misappropriation.

144.    Blockfills intended to induce Dominion to continue depositing funds and to refrain from withdrawing funds by concealing the Misappropriation.

145.    In fact, in November 2025, Blockfills contacted Dominion to solicit further trades.

146.    Dominion reasonably relied on Blockfills not to misappropriate its funds and to immediately disclose any misappropriation of its funds.

147.    Dominion had no reason to believe that Blockfills was misappropriating customer funds.

148.    In early February 2026, Blockfills suspended withdrawals for all customers, including Dominion, preventing customers from accessing their funds and assets.

149.    Blockfills provided no advance notice of the suspension, thereby depriving Dominion of the ability to possess its funds and assets in the account with Blockfills.

150.    This conduct was an unfair practice that caused substantial injury to Dominion.

151.    On February 11, 2026, once it learned of Defendant's actions, Dominion formally requested redemption of 70.5556739914 Bitcoin but Blockfills refused with no lawful basis for doing so.

152.    This conduct was an unfair practice that caused substantial injury to Dominion.

153.    The Account Application with Dominion was entered into in the course of Blockfills' business operations.

154.    Blockfills' deceptive, unfair and unlawful conduct occurred in trade or commerce: namely, in the context of Blockfills' business of providing cryptocurrency trading services to customers.

155.    Dominion suffered actual damages proximately caused by Blockfills' deceptive and unfair practices.

156.    Blockfills' concealment of the Misappropriation prevented Dominion from taking action to protect its interests.

157.    If Dominion had known of the Misappropriation, Dominion would have immediately withdrawn its funds and ceased doing business with Blockfills.

158.    As a result of Blockfills' unfair and deceptive practices, Dominion has been deprived access to the 70.5556739914 Bitcoin held in its account with Blockfills.

159.    If Dominion had known of the Misappropriation, Dominion could have withdrawn its Bitcoin from this account and could have undertaken other strategies or actions to guard against the loss of value in Bitcoin which has occurred since August 2025, which price has in fact fallen from over $123,000 in August 2025 to approximately $67,972.82 at the time that the Misappropriation was disclosed.

160.    Dominion has also suffered other consequential damages, including, but not limited to, lost trading opportunities, as well as collection costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dominion Capital LLC respectfully requests that this Court enter judgment in its favor and against Defendant Reliz Ltd. d/b/a Blockfills.com, and awarding the following relief:

a.    Actual damages against Blockfills in an amount to be determined at trial, including the value of 70.5556739914 Bitcoin, lost trading opportunities, and other consequential damages;

b.    Punitive damages against Blockfills for willful and wanton misconduct in connection with the Illinois Consumer Fraud Act claim, and under common law for the fraudulent concealment and conversion claims, in an amount to be determined at trial;

c.    Prejudgment interest against Blockfills on all damages from the date of the breach or tort at the applicable legal rate;

d.  Post-judgment interest against Blockfills on any judgment entered in Dominion's favor at the applicable legal rate;

e.  Injunctive relief requiring Blockfills to immediately return the 70.5556739914 Bitcoin to Dominion and, in the meantime, to immediately cease using customer funds for corporate purposes, including operating expenses and losses;

f.  Reimbursement of Dominion's collection expenses, including attorneys' fees and costs; and

g.  Such other and further relief as the Court determines proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  New York, New York                     Respectfully submitted,
        February 27, 2026

SULLIVAN & WORCESTER LLP
By: */s/ Anna Lea McNerney*
    David Danovitch
    Anna Lea McNerney
    Christopher Shields
1251 Avenue of the Americas, 19th Floor
New York, New York 10020
Telephone:  (212) 660-3000
ddanovitch@sullivanlaw.com
amcnerney@sullivanlaw.com
cshields@sullivanlaw.com

    Michael T. Dyson (*pro hac vice pending*)
1666 K Street, NW, 7th Floor
Washington, D.C. 20006
Telephone: (202) 775-1200
mdyson@sullivanlaw.com

*Attorneys for Plaintiff Dominion Capital, LLC*